JUDGE CARTER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**19CV8034**

-----------------------------------------------------------------X

JANE DOE,

Civil Action No.

Plaintiff,

-against-

**COMPLAINT**

DAVID K. TOWNES, individually.

Plaintiff Demands a Trial
By Jury

Defendant.

-----------------------------------------------------------------X

Plaintiff, JANE DOE, (hereinafter referred to as "Plaintiff" or "DOE"), by and through Plaintiff's attorneys, **DEREK SMITH LAW GROUP, PLLC,** as and for Plaintiff's Complaint in this action against the Defendant, DAVID K. TOWNES, (hereinafter collectively referred to as "Defendant" and "Defendant TOWNES"), respectfully alleges and complains as follows, upon information and belief:

## NATURE OF THE CLAIMS

1. Plaintiff brings this action, charging that the Defendant TOWNES violated Plaintiff's rights pursuant to, *inter alia,* 18 U.S.C. §2701, 18 U.S.C. § 1030, 18 U.S.C. § 2511, and to remedy violations of the New York State Human Rights Law; New York Executive Law, § 290, *et seq.* ("the Executive Law"); the Administrative Code of the City of New York 8-107 *et seq.* ("NYCHRL"), New York State Labor Law, breach of contract, and fraud based upon the supplemental jurisdiction of this Court pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking declaratory and injunctive relief and damages to redress the injuries that Plaintiff has suffered as a result of, *inter alia*, sex discrimination, together with hostile work environment, sexual harassment, retaliation, sexual assault, intentional access without authorization of a facility where electronic

communication is stored, the use of a machine to capture communications of others, and the intentional accessing of a computer without authorization or in excess of authorization, not receiving fair and adequate wages, and fraud.

## REQUEST FOR A TEMPORARY RESTRAINING ORDER

2. Defendant TOWNES is a successful investment banker and co-founder of a mid-sized investment bank. In contrast, Plaintiff a single mother of a 15-year-old boy and has suffered from multiple family crises in recent years, including the loss of her company before being hired by TOWNES and cancer in her immediate family, which have weakened her ability to defend herself against Defendant TOWNES' physical, emotional, and extralegal attacks.

3. Plaintiff is a well-respected entrepreneur, a member of the New York business community, and has been the chairperson of many charities, nonprofit events, and fundraising activities. Defendant TOWNES hired Plaintiff, because he trusted her talents and virtues to work on challenging and important projects for him.

4. After working for Defendant TOWNES for almost two (2) years, Plaintiff was only paid for less than two (2) months of work. On numerous documented requests, Plaintiff asked Defendant TOWNES to compensate her for the work she completed for him. Defendant TOWNES put the payments off with haphazard excuses, such as, "let me pay it all in one lump sum," or that his bank was "experiencing wiring problems." Defendant TOWNES gave Plaintiff a false sense of security and often used his banking credentials to further assure her he was a man of his word, each time promising Plaintiff she would eventually receive every cent he owed, with interest.

5.  During the time period Plaintiff worked for Defendant TOWNES, Plaintiff worked on a number of projects for him including but not limited to: overseeing several of his residences and storage area relocations, apartment hunting, decorating his Toronto and New York residences, and working as a paralegal to coordinate Defendant TOWNES' legal issues.

6.  In or around the Spring of 2018, it became clear that Defendant TOWNES and Plaintiff would be parting ways. In person and via email, Plaintiff stepped up her efforts for Defendant TOWNES to compensate her for at least a small portion of what he had promised to pay her. After dozens of documented requests and dozens of in-person requests, Defendant TOWNES refused to resolve the dispute by paying Plaintiff even five percent (5%) of what he owed her.  Plaintiffs requests to be paid or to work on a compromise/settlement were met with over two dozen frightening uncontrollable temper tantrums where Defendant screamed dire threats at Plaintiff at the top of his lungs.

7.  Defendant TOWNES, having given many excuses and promises to pay later, ignored Plaintiff's requests to be paid for almost two years and merely pretended to engage in the dispute resolution process by saying he, "just wanted a calm conversation," a "fair unwind," and a "peaceful resolution" or "I just want a calm and fair settlement" while simultaneously psychologically torturing and bullying Plaintiff for months to stall making good on his promises. Defendant TOWNES insisted that Plaintiff make dozens of trivial changes to the agreed contract and promised in front of witnesses to sign the final copy. At the last minute, instead of signing as promised, Defendant TOWNES blackmailed Plaintiff by stealing over six figures worth of Plaintiff's share of furniture, art, household belongings, electronics, heirlooms, jewelry, computer, and her and her young son's personal effects to use as collateral in his blackmail of Plaintiff.

8. Defendant TOWNES repeatedly and violently threatened that Plaintiff would never see her belongings again unless she promised in writing that she would not report his crimes or take him to court to collect her wages. Defendant TOWNES did this in order to silence, blackmail, and extort Plaintiff from exercising her legal rights. Defendant TOWNES made these communications on a number of occasions in writing, via phone, and in person.

9. Defendant TOWNES accessed Plaintiff's computer without her knowledge and consent, and extracted from said computer Plaintiff's private rolodex containing the contact information for over a thousand high-profile individuals. Defendant TOWNES also threatened to use his power, influence, and Plaintiff's private business and social rolodex of over a thousand important people to bully, silence, and character-assassinate Plaintiff. Defendant's sole intent was to use her rolodex to extort, blackmail, coerce, intimidate, and stop Plaintiff from exercising her legal rights to collect on her wages owed and file a claim for the discriminatory, harassing, and retaliatory actions she was subjected to. This Rolodex was only on Plaintiff's laptop with only one older copy locked in her closet. It was never ever left in any common areas and could be accessed only on her password-protected computer.

10. On multiple documented occasions, Defendant TOWNES threatened to use this stolen list to take extralegal actions against Plaintiff if she tried to collect the money TOWNES owed Plaintiff, including threatening to "absolutely destroy [Plaintiff's] reputation," which Defendant TOWNES knows would most certainly and irreparably injure Plaintiff by destroying her capacity to work on as a consultant, and thereby destroying her ability to support herself and her child.

4

11. Adding insult to injury, to further ensure Plaintiff's silence, Defendant TOWNES went so far as to violently make at least three clear threats at Plaintiff's life if she brought legal action to get her wages and/or stolen belongings back.

12. Plaintiff also has a list of many other creditors whom Defendant TOWNES owes tens of thousands of dollars and has refused to pay.

13. Additionally, Defendant TOWNES' contempt for laws that constrain his behavior; his history of using extralegal strategies to deceive immigration officials, judges, law enforcement, and tax authorities; and his willingness to employ unethical bully tactics against those who try to confront him are well-known and well documented.

14. The magnitude of the combined threats, extreme emotional abuse, and painful physical attacks made it impossible for Plaintiff to walk away from all her hard work and stolen valuables. Nor could Plaintiff morally or ethically allow Defendant TOWNES to continue to con, deceive, or hurt other victims.

15. Defendant TOWNES, before his interactions with Plaintiff, had a particularly decorated history of assault, harassment, intimidation, possession of stolen property, breaking and entering, and stealing and destroying others' belongings. This is evidenced in several police reports, court records, and witness statements.

16. Defendant TOWNES also has over a dozen criminal reports and Judge's contempt orders from the years 2013, 2014, 2016, and 2018. On Oct 30, 2018, Defendant TOWNES was also sentenced to thirty (30) days in Nassau County jail.

17. Criminal reports include perjury in 2018 where it was proven that Defendant TOWNES lied under oath to the Court, stating that he was homeless and had lost his possessions. Defendant TOWNES lied to the Court so he could get a free court-ordered attorney while maintaining

numerous European residences, making hundreds of thousands per year, living on Park Avenue in a luxury building with a doorman, and sitting on millions in company stock and millions more in ill-acquired marital assets hidden from his ex-wife in European bank accounts.

18. Defendant TOWNES' threats against Plaintiff must be taken very seriously now that she has begun court proceedings and he must be enjoined and restrained from following through on the vicious threats he has promised in writing to follow through with.

19. Defendant TOWNES has shown a blatant disrespect in the past for court orders, has an extensive history of disobeying judges, has been in contempt of court many times, and has spent time in jail for such violations. Plaintiff asks the Court to protect Plaintiff from Defendant TOWNES' threats of retaliation and further physical, verbal, and psychological abuse by imposing a severe penalty if Defendant TOWNES uses Plaintiff's rolodex, releases her information or name to the press, or uses any other means to further intimidate and retaliate, defame, and destroy her reputation as he promised.

## JURISDICTION AND VENUE

20. Jurisdiction of this action is conferred upon this Court as this case involves a Federal Question under 18 USC §1030. The Court also has jurisdiction pursuant 28 U.S.C. §1331, §1343 and pendent jurisdiction thereto.

21. Additionally, this Court has supplemental jurisdiction under the State law causes of action asserted in this action.

22. Venue is proper in this District based upon the fact that the events or omissions which gave rise to the claims asserted herein occurred within the Southern District of New York.

23. Venue is also proper because Defendant TOWNES resides within the District.

## PARTIES

24. Plaintiff DOE is an individual female residing in the State of New York, County of New York.

25. At all times relevant to this Complaint, Plaintiff DOE was employed by Defendant TOWNES as an Executive Personal Assistant.

26. At all times material, Defendant DAVID K. TOWNES, (hereinafter referred to as Defendant TOWNES or "TOWNES") is an individual male who employed Plaintiff.

27. TOWNES has an address within New York City and is domiciled in New York State. TOWNES controlled many tangible aspects of Plaintiff's job duties, including holding the power to discipline, hire, and fire Plaintiff.

28. Upon information and belief, at all times relevant to this Complaint, Defendant TOWNES meets the definition of an "employer" under all applicable state and local statutes.

## FACTUAL ALLEGATIONS

### Unpaid Regular and Overtime Hours Worked for Defendant TOWNES

29. In or around February 2016, Defendant TOWNES contacted Plaintiff to inquire if she knew any decorators that could help decorate his new New York City (hereinafter referred to as "NYC") apartment. Defendant TOWNES knew Plaintiff from previous social interactions.

30. After Plaintiff explained to Defendant TOWNES the high costs involved with hiring a decorator within New York City, Defendant TOWNES asked Plaintiff's help with furniture ideas for his New York City apartment. For several weeks, Plaintiff helped Defendant TOWNES at no charge as a friend and in gratitude, Defendant TOWNES insisted Plaintiff

and her son feel free to use his small empty studio apartment for a short time before they left on their move back to Florida.

31. On or about April 3, 2016, Defendant TOWNES called Plaintiff at her home in Florida and hired her to relocate to work for him, explaining she would be working and staying in the guest-room at one of his five (5) homes in Europe or North America.  TOWNES told Plaintiff he needed her to start immediately to deal with his numerous emergencies.

32.  On or about April 3, 2016, Defendant TOWNES offered Plaintiff a wage of five hundred dollars ($500) per day of work at a flat rate, and asked her to fly immediately to New York City to start working.

33. Defendant TOWNES explained that the job would require months of long hours on emergency projects, and that there would be other periods where he would be traveling and she would not be needed until his return. Defendant TOWNES indicated that his guest room would be hers for the duration. He explained this was the same arrangement he had with his female London live-in-assistant for a number of years.

34. Plaintiff, living in Florida at the time, abandoned her townhouse and the new three-year lease on her car and quickly relocated to New York City. Plaintiff moved in to the guest room at Defendant TOWNES' apartment  to work for him per his request.

35. Plaintiff, who had already paid a number of months in advance on the six (6) month lease on her townhouse, forfeited those monies in reliance on the income she would earn working for Defendant TOWNES. As a prominent New York investment banker, Plaintiff had no doubt Defendant TOWNES would pay her what he promised.

36. Plaintiff also had a three (3) year lease on a car which she only used once after moving to work for Defendant TOWNES. She was contracted to pay $15,400 for this car, including insurance, and she would not need it or use it in NYC.

37. Plaintiff relied on Defendant TOWNES' promise that Plaintiff would work for him, and in reliance on that promise, she forfeited not only all other business opportunities she was working on at the time, but also her car and home lease in Florida. The home lease had been paid for many months in advance and the car was a future commitment.

38. On or about May 10, 2016, Plaintiff provided her time tracker to Defendant TOWNES via email with a Google Docs document containing the days and times that she worked in Toronto and New York. Defendant TOWNES stated via e-mail that he received the said Google Docs timesheet and requested it as a Word document. In response, Plaintiff, through a technology savvy friend, sent Defendant TOWNES the time tracker for her hours a second time in a Microsoft Office Word document.

39. On or about April 26, 2016, Defendant TOWNES said he would pay Plaintiff for her hours worked in the amount of $1,791.00. Plaintiff has been unable to confirm the wire ever arrived.

40. On or about May 12, 2016, Defendant TOWNES paid Plaintiff for her hours worked from April 9, 2016, through May 5, 2016, in the amount of $5,833.09. This was the first, last, and only payment that Defendant TOWNES made to Plaintiff for her hours worked, despite her working over the next two (2) years. Any other payments went only to reimburse the thousands of dollars that TOWNES requested Plaintiff put on her personal credit card for him. Defendant TOWNES also burdened Plaintiff with thousands of dollars of debt she incurred for him on her credit card that was never reimbursed.

41. As an example, on or about November 10, 2016, Defendant TOWNES, in an electronic communication, directed Plaintiff to use her own personal credit card and told her, "I will reimburse directly to your card within three (3) days of any request, for any charges related to our common endeavors you place on your card." (*sic*)   Defendant TOWNES owes Plaintiff thousands of dollars for debt she incurred for him on her personal credit card at very high interest rates. She requested many times before they parted ways that this debt be paid off.

42. Defendant TOWNES refused to pay.

43. On or around May 20, 2016, Defendant TOWNES offered a deal with Plaintiff that she would continue at her hourly rate to decorate his New York City apartment. However, instead of getting the typical salary plus thirty percent (30%) commission on furniture she purchased for the apartment (similar to a what a decorator charges), Defendant TOWNES offered Plaintiff a long term 50/50 ownership split of the furniture, art, and other smaller chattel if she would wait instead of immediate payment on the furniture commission. The understanding was that if Plaintiff ever stopped working and living under the same roof, that Defendant TOWNES would buy back selected pieces for the replacement value at double their cost as they were bought wholesale, or just let Plaintiff keep half of the furniture. Of particular note is that Plaintiff never gave up her right to earn her hourly income – this commission structure was provided *in addition to* Plaintiff's daily rate.

44. Plaintiff agreed to forgo this commission, and agreed to a shared interest in the items she chose when decorating, because at the time, it seemed like a long-term working relationship. Defendant TOWNES, much older than Plaintiff, also promised that, if and when he passed away, his fifty percent (50%) ownership would be Plaintiff's, free and clear.

45. In or around the Fall of 2016, Defendant TOWNES promised to pay Plaintiff for all monies owed for her work conducted over the Summer and early Fall of 2016, including all hours included on her second time tracker, as soon as possible. This second time tracker came to $17,755.62, and Defendant TOWNES promised to pay this with a generous interest as a late fee. This amount did not include overtime.

46. Defendant TOWNES advised Plaintiff that all future earnings after the Fall of 2016 should be tracked by Plaintiff, but that she would have to wait until his divorce proceedings were finalized or he received a large bonus from his firm before Plaintiff could be paid. Defendant TOWNES informed Plaintiff that he had a lot of money, but that he could not access his European accounts for fear his ex-wife could track them down.

47. Defendant TOWNES promised Plaintiff, "Keep track of all the other hours you work and I will of course eventually pay you for everything I owe you, with interest."

48. Plaintiff, believing Defendant TOWNES, continued working for him on an on-again off-again schedule.

49. Plaintiff would not have spent hundreds of hours continuing to  work on projects for Defendant TOWNES for free without believing she would be paid her hourly rate eventually.

50. In or around the Fall of 2016, Defendant TOWNES tasked Plaintiff to take over and work as a paralegal on his court case. As Defendant TOWNES could not find a lawyer to work for a contingency fee on his matrimonial matter, he asked Plaintiff to work on the case at her normal hourly rate with a ten to fifteen percent (10% - 15%) bonus of his share of the marital estate once the divorce was finalized and divided. Plaintiff agreed to take on this complicated and difficult project.

51. On or about May 26, 2017, after being placed in an extraordinarily toxic work environment involving constant screaming temper tantrums and physically aggressive behavior from Defendant TOWNES,  Plaintiff told Defendant TOWNES that she could no longer work on the stressful paralegal tasks anymore but could continue to work on his other items. In an email to Defendant TOWNES, Plaintiff stated, "As I said in the past emails. I'm OUT. I will not be Involved any more. I've spent the past months working hard just to be yelled at, completely taken for granted and not listened to. (*sic*)"

52. A few months later, in an email, Defendant TOWNES begged Plaintiff to come back and resume her paralegal work. Plaintiff agreed to return and continue working on his court case only if they changed the structure of their bonus agreement to include a minimum guarantee of $100,000 due to the incredibly stressful nature of the job. She did not give up her 10 to 15% or her hourly wage previously promised, but rather insisted on the first $100,000 being a minimum guarantee no matter what the outcome of his divorce proceedings. Defendant TOWNES agreed and told Plaintiff that her share would most likely amount to much more than that. Plaintiff started working again in earnest for Defendant TOWNES on his court case.

53. On or around August 12, 2017, After being exposed to further extreme abuse, Plaintiff informed Defendant TOWNES again via email that she will not continue to work on Defendant TOWNES legal case and stated: "Because you take your insane anger out on me i will never ever ever even in an emergency help you with this case, you should be kissing the ground I walk on for the huge huge amount of help and work ive done to help your chances rather than treat me in the abusive way you do. Don't ask me to read or look at anything to do with the case ever again. You are impossible, belligerent and I'm ONLY trying to help

you!!! So please understand after your outburst and toxic attitude to me today that I will want to be in my room alone and not want to go near you this week. Im shaking Im so upset that you think its ok to treat me this way." (*sic*)

54. Plaintiff made requests and reminders in November, December, and January 2017 to be paid. Although TOWNES provided Plaintiff with some reimbursements for purchases made on Plaintiffs credit card for thousands she had spent on items requested by Defendant, no payments were made towards her salary or hours worked.

55. On or about February 21, 2017, Plaintiff again sent Defendant TOWNES the time tracker from the summer and early fall of 2016, documenting her hours worked and the interest accrued in an amount of approximately $22,000. Plaintiff, again, requested to be paid.

56. On or about March 4, 2017, Plaintiff sent Defendant TOWNES another time tracker document outlining her hours worked and requested to be paid.

57. On or about April 2, 2017, Plaintiff again emailed Defendant TOWNES asking him to be paid. Defendant TOWNES told Plaintiff that he did not currently have the money to pay, but was waiting on a big deal to close.

58. On or about April 22, 2017, Plaintiff again emailed Defendant TOWNES after a freighting and highly abusive work day and asks to be paid stating: "Realize how your toxic, terrible, uncontrollable anger at your x infects every fiber of the people you are around soul. I was so traumatized by trying to help you yesterday that I was afraid to come out [...] You were very very abusive and screamed and yelled at me and I needed a week literally afterwards to even deal with the world [...] when I'm constantly having to get the payload of your toxic anger and lack of control and it's powerful negative effects on my soul I can only keep saying "there is NO EXCUSE FOR ABUSE!!!!! [...] until I have solved this situation and you can

pay me the money you owe me from my hard hard months of work and you have learned or decided to work on the points above that make me lock myself inside my room because I'm so afraid of even bumping into you. (*sic*)"

59. Plaintiff relied on Defendant TOWNES' promises that he would pay her in one big lump sum, with interest, when his (1) Christmas bonus came in, (2) his funds were unfrozen, (3) he closed a big deal, or (4) his divorce was finalized. Despite the extremely toxic work environment, Plaintiff continued working for Defendant.

60. Plaintiff continued to work for Defendant TOWNES at reduced hours in reliance on his promise that he would ultimately pay. Plaintiff became afraid that TOWNES may have no intent of ever paying her.

61. On or about January 23, 2018, Plaintiff learned Defendant TOWNES received his bonus. However, he still had not paid Plaintiff even a partial payment towards what he owed her.

62. At the time of his large bonus, habitually not paying what he had promised by contract to pay, Defendant TOWNES also purposely failed to pay at least three landlords he owed money to and numerous other parties he was in debt to.

63. On or about January 23, 2018 Plaintiff sent another demand note to Defendant via electronic communication, stating, "pay me at least for the hard long hours of hard work I did in toronto. ( 5k ) NOT paying me when i worked so hard will just mean when you have the next emergency i will not be there to help [...] You made many promises to pay me and have broken them over and over. You NEED to pay me at least 5k for the work I did in toronto to so carefully pack and move your things IMMEDIATELY [ ... ] NOT paying me is taking great advantage of me .. you should NOT be buying books or going to utah when you know a single mom you begged to rescue you did so with all her heart and now when

you can pay you refuse. I will NOT take no for an answer on the 5k min towards the 19k you owe me for all the months over a year ago I worked for you. You made a promise and need to deliver on that promise. Asking me to wait for 20k is NOT ethical [...] I worked extreamly hard for you. Now you seem to have lost your conscience and think its ok to pay others and to just screw me [...] How can I trust you dave ? [...] This is NOT fair. How can u expect me to just be last on the list of who gets paid. (*sic*)"

64. On or about March 2, 2018, Defendant TOWNES informed Plaintiff that she will need to relocate, because Defendant TOWNES was moving to a smaller one-bedroom apartment, and that due to his divorce proceedings, he had no money to pay her going forward.

65. Plaintiff demanded to know when Defendant TOWNES would pay her for the last two (2) years' work. Plaintiff also asked Defendant TOWNES how he intended to allocate the 50/50 furniture split as per their decorating agreement and asked again about her paralegal bonus.

66. In response, Defendant TOWNES stated that he wanted "peaceful and constructive unwind instructions." While saying that he wanted a "calm and fair resolution" and a "fact based discussion," or " I am seeking fairness and peace," he had no intent on paying his debts. Instead, Defendant became overtly hostile, using blackmail and bullying tactics, repeatedly harassing and assaulting Plaintiff, and screaming dozens of threats at the top of his lungs to hurt and even to kill Plaintiff if she tried to use legal recourse to collect what she was promised.

67. Defendant TOWNES also stole numerous important, sentimental, and valuable personal items from Plaintiff to use as blackmail collateral. He promised that, if Plaintiff did not give up her legal rights in writing and rescind her police harassment reports against Defendant TOWNES, she would "**never see her precious things again.**"

68. Defendant TOWNES did virtually everything possible to thwart and stall a mutually acceptable outcome. Even after Plaintiff conceding on over ninety-five percent (95%) of her amounts due (by claim count and financial value) in dozens of emails to avoid a costly legal battle, Defendant TOWNES still refused to compromise.

69. Defendant TOWNES had no intention of paying anything he owed. At times, Defendant TOWNES pretended to work in good faith and promised to sign the furniture and art agreement where Plaintiff agreed to walk away from everything other than a small portion of Plaintiff's share of the furniture and art. In order to try to settle quickly, Plaintiff agreed in desperation to loan many of the stolen and disputed items that Defendant TOWNES had agreed in emails and in the unwind would be Plaintiffs back to Defendant TOWNES until his death or until he left the city.

70. Meanwhile, despite this generous capitulation, Defendant TOWNES was secretly stealing Plaintiff's valuable rolodex of important contacts with the sole intention of using Plaintiff's rolodex as leverage to blackmail and prevent her from exercising any legal rights. His manipulative pretenses for "a fair and peaceful resolution" or wanting a "fact based settlement" were all a ploy to stall the legal process until he had enough to blackmail her with so he would not have to pay her a dime and be able to keep most of Plaintiff's share of the furniture, art, and chattel.

71. Defendant TOWNES planned months in advance and went to great lengths to con, fraud, mislead, and manipulate Plaintiff, to coerce Plaintiff to continue to work on his projects, knowing full well Defendant TOWNES never intended to pay Plaintiff her wage or promised bonuses, and to ensure Defendant TOWNES could keep Plaintiff's share of the agreed upon furniture and art.

16

72. On numerous documented occasions, Plaintiff begged Defendant TOWNES to pay her for all of her hours worked.

73. Defendant TOWNES refused.

74. Defendant TOWNES owes Plaintiff for over two thousand (2000) hours worked between approximately April 2016 and April 2018.

## Sexual Assaults and Hostile Work Environment

75. During the time Plaintiff worked for Defendant TOWNES, she was subjected to dozens of incidents involving a hostile work environment based on her sex including unwelcome touching, groping, and sexual assault.

76. These unwanted and unwelcome instances of forceful touching included pinching Plaintiff's buttocks, squeezing and twisting Plaintiff's breasts so aggressively as to cause residual pain that lasted for numerous days thereafter, and multiple attempts at physical touching of Plaintiff's vagina and other sexual organs.

77. On several occasions, Defendant TOWNES informed Plaintiff that due to his ex-wife freezing his bank accounts, Plaintiff must find a short term roommate for Defendant TOWNES. Defendant TOWNES also told Plaintiff that she could leave her employment and place of living to go to one of his other residences in Europe for several months, or sleep with Defendant TOWNES in his room. This harassment caused a very hostile work environment and serious disruptions to the rest of Plaintiff's life.

78. The accounts of discrimination, hostile work environment, and retaliation are too numerous to detail in this instant complaint, and the following are provided by way of example.

## The Sexual Assault in the Elevator

79. In or around October of 2016, Defendant TOWNES and Plaintiff were attending an event together. Plaintiff was dressed in a light evening dress.

80. Immediately upon entering the elevator, Defendant TOWNES grabbed both of Plaintiff's breasts with his hands and squeezed extremely hard as to cause Plaintiff to suffer extreme pain. This pain in Plaintiff's breasts did not subside until several days later. Her resulting continued pain was witnessed by other of TOWNES' employees

81. Then, Defendant TOWNES proceeded to twist Plaintiff's breasts to the right and would not let go.

82. Plaintiff screamed in pain, "**DAVE! STOP! YOU JUST CAN'T JUST GRAB PEOPLE'S BOOBS AND SQUEEZE SO HARD THAT YOU HURT THEM!**"

83. Defendant TOWNES grinned from ear to ear and appeared to enjoy inflicting pain on Plaintiff.

84. Plaintiff said to Defendant TOWNES, "**PERHAPS YOUR FIANCE WOULD LIKE TO HEAR ABOUT THIS!**"

85. During just the first year of her employment Plaintiff is aware of 4 women he was either engaged to or whom he proposed to.

86. Defendant TOWNES replied, "**I think we better not tell her.**"

87. Plaintiff, still in pain, replied, "**WELL, DON'T EVER DO THAT AGAIN!!!**"

88. Defendant TOWNES sexually assaulted Plaintiff by grabbing her breasts and twisting them so hard as to cause her severe physical pain.

89. Defendant TOWNES' ongoing unwelcome conduct of a sexual nature had the purpose and effect of unreasonably interfering with Plaintiff's work environment.

## The Sexual Assault After Attending a Musical Event

90. On or about April 25, 2017, Plaintiff was invited to a musical event at 101 E. 63rd Street. Plaintiff invited Defendant TOWNES to accompany her to the event, knowing he was going through some personal issues and could use a morale boost. Defendant TOWNES had two glasses of wine at the event.

91. When arriving back to the apartment, Plaintiff made dinner and served it sitting on the other side of the couch from TOWNES. Defendant TOWNES patted the seat next to him and said to Plaintiff, **"Don't sit way over there. Come and sit next to me."**

92. Plaintiff, thinking nothing unusual about the request, walked over to sit down next to Defendant TOWNES. As Plaintiff took her seat, and unbeknownst to her, Defendant TOWNES had put his hand outstretched, flat, palm facing upward, on the seat beneath her.

93. Defendant TOWNES then proceeded to grab beneath Plaintiff's dress and buttocks and slid his hand into her crotch area in order to grab Plaintiff's vagina in an extremely aggressive and inappropriate way.

94. Plaintiff, in utter shock after just having her buttocks and vagina touched by her employer, jumped up and angrily exclaimed, **"Dave, what the hell are you doing?"**

95. Defendant TOWNES slyly replied, **"Don't blame me! You're the one who sat on my hand!"**

96. Plaintiff would never purposely sit on Defendant TOWNES' hand nor would she have any reason to.

97. TOWNES' positioning of his hand was deliberately meant to sexually harass and initiate sexual contact with Plaintiff, and in doing so, Defendant TOWNES sexually assaulted Plaintiff.

## **The Sexual Harassment, Hostile Work Environment, Assault, and Battery**

98. During the first months of Plaintiff's employment with Defendant TOWNES, Defendant TOWNES, desperate for a physical relationship, often expressed his romantic interest in Plaintiff. Defendant TOWNES offered to marry Plaintiff, solicited Plaintiff for a sexual relationship, and even asked Plaintiff if she would have another child with him. Plaintiff made it politely clear that this would not happen.

99. On a number of occasions, Defendant TOWNES called Plaintiff at night while he was travelling. Plaintiff always asked, "Why are you breathing so heavily?" TOWNES would respond, "I'm not allowed to breathe?!" or on another time "Can't I breathe?" During those calls, Defendant TOWNES would breathe heavily into the phone such that Plaintiff believed he was masturbating.

100. Plaintiff repeatedly let Defendant TOWNES know that there would never be a romantic or sexual relationship between them.

101. Plaintiff frequently reminded TOWNES that he was her boss and she was his employee and only a friend, and any sexual relationship was out of the question.

102. By way of example, Defendant TOWNES often engaged in inappropriate and unwanted sexual conversations in which he would brag to Plaintiff about his sexual abilities, how he could "**go all night**," and the large size of his penis.

103. Plaintiff warned Defendant TOWNES every time that these comments were inappropriate, disgusting, and extremely unwelcome, because they made her feel very uncomfortable. Plaintiff frequently reminded TOWNES that he was older than her mother.

104. On many different occasions, Defendant TOWNES boasted about his sexual abilities with Viagra and made a number of comments such as, **"You should give it a try"** (in reference to his penis) and **"Younger men have nothing on me."**

105. Defendant TOWNES made numerous comments about having a **"BIG PENIS"** and how virile he was.

106. Defendant TOWNES also liked to talk about his fetish to wear tight black ladies' underwear and the way it made his penis feel. Defendant TOWNES told Plaintiff it made him feel sexy and that he would often just wear them and nothing else around the apartment. Plaintiff told Defendant TOWNES this was inappropriate and not a subject she felt comfortable discussing.

107. By way of example, on at least half a dozen times when Defendant TOWNES walked by Plaintiff, he pinched or grabbed her butt. Plaintiff always responded and complained to Defendant TOWNES that this behavior and touching was inappropriate and unwelcome.

108. Defendant TOWNES engaged in numerous instances of unwanted and unwelcome conduct of a sexual nature by touching Plaintiff. This touching had the purpose and effect of unreasonably interfering with Plaintiff's work environment.

### The Sexual Assault Before the Art Gallery Event

109. On or around June 1, 2017, Plaintiff invited Defendant TOWNES to accompany her to an art exhibition. Plaintiff wore a cocktail dress.

110. Prior to leaving the apartment, Defendant TOWNES commented on how pretty Plaintiff looked. Defendant TOWNES then grabbed Plaintiff's breasts extremely hard and twisted them to the right. He repeated the sexual assault in the elevator that occurred just six (6) months earlier.

111. Plaintiff was physically hurt and was extremely mad at Defendant TOWNES. Plaintiff loudly told Defendant TOWNES that he did not have her consent to touch her or to hurt her in a sexual way and told Defendant TOWNES that he needed to get help for his manic episodes. Plaintiff did not speak to Defendant TOWNES on the way to the event.

112. Plaintiff recalls thinking something was psychologically wrong with Defendant TOWNES because he enjoyed physically hurting and demeaning women.

113. Plaintiff made a decision that she needed to distance her friends from Defendant TOWNES and be more careful about introducing Defendant TOWNES to anyone. Plaintiff made a decision to cut of almost all social contact and invitations to social events with TOWNES.

114. Plaintiff complained about Defendant TOWNES to another employee who saw Plaintiff grimacing in pain for several days after Defendant TOWNES twisted her breasts. Plaintiff's breasts hurt so much that she could not turn in bed.

## The Sexual Assaults in Defendant TOWNES's Home

115. Defendant TOWNES had a live-in assistant in London to help him with his accounting and take care of his London apartment. This live-in assistant also lived in one of the guest rooms of his London apartment rent free for many years and received a salary for the hours she worked.

116. To induce Plaintiff to work for him, Defendant TOWNES indicated that Plaintiff would have access to his other residences during her downtime.

117. On Defendant TOWNES' instruction, and as part of her employment contract, Plaintiff resided with Defendant TOWNES in order to provide him decorating, paralegal work, organization and upkeep of his North American properties, apartment searches, and

oversight of movers, moves in and out, and any other things he may need assistance with. Plaintiff also flew to London for him with important documents he needed to get to his London assistant.

118. In the Spring of 2017, Defendant TOWNES' massive temper tantrums, emotional abuse, and screaming became much worse, mostly due to his court case with his ex-wife.

119. The sexual assaults and degradation against Plaintiff also became more prevalent. Plaintiff, who was living in the guest room at the time, purchased a lock for her door and barricaded herself in her room while Defendant TOWNES often screamed and yelled at the top of his lungs and threw things around in his room and in the common areas.

120. By way of example, Defendant TOWNES trapped Plaintiff in the small kitchen where he would grab Plaintiff and pull her close to him to squeeze her buttocks as hard as he could, or to grab her hips or waist so that Plaintiff could not get away from him.

121. By way of example, on another occasion, Defendant TOWNES tried to push himself next to Plaintiff in order to touch her breasts while she was trapped in the tiny kitchen.

122. On these occasions, Plaintiff said to Defendant TOWNES, "**Let me out of the kitchen right now! STOP trapping me in the kitchen,**" and Plaintiff repeated to him, "**If I'm in the kitchen, you're not allowed in!**"

123. Defendant TOWNES said, "**I can't come into my own kitchen**?"

124. Plaintiff replied, "**No, because you purposely trap me in it!**"

125. Defendant TOWNES frequently kept his door open to hear if Plaintiff came out of her room so he could walk into the tiny kitchen to purposely trap her. Defendant TOWNES would often move close to Plaintiff in the tiny kitchen and try to touch her.

126. Defendant TOWNES knew this intimidated and upset Plaintiff and made her very uncomfortable, because Plaintiff told him on a number of occasions and asked him nicely yet firmly to leave the kitchen every time he tried to enter after numerous forcible touching incidents.

127. Plaintiff told Defendant TOWNES that it made her feel uncomfortable and claustrophobic to be in the small kitchen with him. Defendant TOWNES, without any reason to use the kitchen, kept his bedroom door open to hear Plaintiff so he could keep up this cat-and-mouse psychological intimidation where Plaintiff would have no way to escape from him.

128. Defendant TOWNES' sexual assaults of Plaintiff in the kitchen were so psychologically intimidating and upsetting that Plaintiff barricaded herself in her room to work and to minimize her interactions with TOWNES.

129. Plaintiff purchased a small refrigerator for her room and also purchased a coffee maker, microwave, and a water filter for TOWNES' room to replace the few things he needed to use in the kitchen.

130. On or about July 13, 2017, after numerous requests for over a year for Plaintiff to move into Defendant TOWNES's room and sleep in his bed were all revoked, Defendant TOWNES physically moved his bed into her small bedroom, placing it directly next to her bed and informed her that he would be sleeping next to her in her room from now on.

131. This was extremely psychologically terrorizing to Plaintiff, who at this point was owed over a year in back-pay, had already been sexually assaulted and harassed by Defendant TOWNES numerous times, and had suffered greatly from his abusive, toxic, raging temper tantrums and his threats to kill his wife. This invasion of her private space put her in an extremely fearful and vulnerable position.

132. From on or about July 14, 2017, to on or about July 16, 2017, a mutual friend intervened to convince Defendant TOWNES to remove his bed from Plaintiff's room, because she was so upset.

133. In several emails to Defendant TOWNES from the mutual friend, he says, "Moving yourself into a girls room is about as invasive as anything could be short of physical rape," "You can't just ignore how traumatic this is for a woman," "In my wildest, most depraved and drunken state, I could never imagine moving my bed into another woman's room unless she wanted me there. It defies all reason and logic to see you doing this to her," "Your room invasion is turning her life into a nightmare," "I'm just trying to make it clear how inappropriate and disgusting it is for an older man to move into a girl's room," "I'm aghast at your decision to move into her room. I can't imagine any sane man doing that to a girl," "You have now thrust her into nearly the worst nightmare that any girl could imagine."

134. Defendant TOWNES still refused to move his bed out of Plaintiff's room.

135. On or about, July 19, 2017, Plaintiff sent a message to Defendant TOWNES's son: "I was shaking and crying when I left you the message [...] he is irrational, illogical and unpredictable [...] he moved his bed and a bunch of his Ikea shit Into my room! (*sic*)"

136. On or about July 20, 2017, Plaintiff informed Defendant TOWNES in an email that she was sad, upset, and horrified at this invasion of her privacy. She reiterated in an email that Defendant TOWNES "wanting to sleep with her was unacceptable."

137. Plaintiff wrote in an email to Defendant TOWNES, "I will not let bad ugly Dave do hurtful things to me," and, "There is no excuse for abuse."

138. On or about July 20, 2017, Plaintiff moved Defendant TOWNES's heavy bed and other things back into TOWNES' room and let Defendant TOWNES know she had the legal right to call the police if he enters her room again without her permission.

139. In or around the Spring of 2017, Defendant TOWNES and Plaintiff were in the hallway one night near the front door. Out of the blue, Defendant TOWNES grabbed beneath Plaintiff's dress to her buttocks on the bottom inside of her thigh and tried to get as close as he could to her vagina. Defendant TOWNES squeezed the area extremely hard.

140. Plaintiff said, "Stop it! You can't do that!"

141. Plaintiff jumped 4 or 6 steps away towards her room and yelled, "STOP!"

142. Defendant TOWNES said, **"IF YOU'D LIKE TO COME IN ANY TIME AND TRY MY VERY BIG PENIS, YOU ARE WELCOME TO COME IN."**

143. Defendant TOWNES said, **"NO VIAGRA NEEDED"** and stated that he had **"THE STAMINA OF A 25-YEAR-OLD."**

144. Again, Defendant TOWNES instructed Plaintiff to **"COME IN AN SEE FOR [HERSELF]."**

145. Defendant TOWNES grinned and said, **"WOMEN ALL SAY THAT I'M A TIGER IN BED, AND I HAVE A HUGE, STRONG PENIS."**

146. After these extremely inappropriate statements, Defendant TOWNES grabbed his crotch and said, **"I AM MORE VIRILE THEN ANY OF THOSE YOUNG GUYS YOU'VE BEEN WITH! FEEL FREE TO COME INTO MY ROOM ANY TIME TO FIND OUT FOR YOURSELF."**

147. PLAINTIFF responded, **"That's disgusting."**

148. Plaintiff had told Defendant TOWNES several dozen times that she would never be interested in him sexually and had often requested that he stop making her uncomfortable with sexual comments.

149. On or around December 17, 2017, after Plaintiff returned from London, Plaintiff was standing in the living room about five (5) feet from the kitchen.

150. Defendant TOWNES grabbed Plaintiff's breasts again and squeezed them extremely hard.

151. Plaintiff responded sharply, **"OUCH, STOP! YOU CAN'T DO THAT! IT HURTS."**

152. By way of example, Defendant TOWNES often appeared in the living room and common areas almost naked wearing only his underwear, or often just a shirt with several buttons done up with no underwear and nothing else.

153. Plaintiff asked Defendant TOWNES at least a dozen times to refrain from exposing himself in the common areas.

154. This was extremely inappropriate and hostile because early 20-year-old assistants were brought in to help Plaintiff and/or Defendant TOWNES work in Defendant TOWNES' home on different occasions on technical and other issues, as neither were very tech savvy.

155. In or about the second week of December 2017, a young assistant quit because Defendant TOWNES exposed himself in this way.

156. On or about December 16, 2017, in an electronic communication, Plaintiff informed Defendant TOWNES: "One of my young assistants quit because you walked around with your underwear and your shirt on I kindly reminded you many times that she was a young girl and it was not appropriate [...] PLEASE do NOT have one of your bipolar manic depressive episodes over xmas !!!! It is terrible for everyone around you. And takes our time off moving forward. Since three women have complained about inappropriate dress code

around them with you being half naked with no shirt on i had full right to remind you […] Please remember the dozen times you came out half naked or just in your tighty whites and i told you it made me uncomfortable!!!!! (*sic*)"

157.   Defendant TOWNES' assistant in London was subjected to the same nudity and was also offended by the same.

158.   Defendant TOWNES also made unwanted advances towards his London assistant. Despite being forty-four (44) years younger than Defendant TOWNES and a friend of his son's, she was put in a very uncomfortable situation when he made inappropriate passes at her.

159.   By way of example, despite the huge age difference, Defendant TOWNES also proposed marriage to his live-in London assistant. She turned him down.

160.   Another of Defendant TOWNES' full-time New York City executive secretaries quit from an uncomfortable work environment, saying to Plaintiff, "I DON'T KNOW HOW YOU CAN STAND WORKING FOR HIM" before resigning from her position and leaving midday without notice.

161.   On or around June 1, 2018, Plaintiff moved out of the apartment.

**Assault, Extortion, Harassment, Blackmail, Coercion, and Intimidation**
**Plaintiff Engages in Protected Activity**

162.   Knowing she was leaving in or around the Spring of 2018, Plaintiff began pressuring Defendant TOWNES to pay her for all the hours she had worked since her last payment in May of 2016.

163.   At this point, it had been over eighteen (18) months since Defendant TOWNES' last payment to Plaintiff for her wages.

164. Plaintiff accrued in excess of two thousand (2000) hours of work for Defendant TOWNES without pay.

165. When Plaintiff kept asking to be paid, Defendant TOWNES became very hostile and repeatedly told Plaintiff she was bullying him and not acting in good faith. In reality, Defendant TOWNES repeated to Plaintiff what he had done to his ex-wife when they separated, such as breaking and entering; stealing and/or smashing her valuables and family heirlooms; harassing, intimidating, threatening, and assaulting her; and stealing the records she needed for her court case against him.

166. During the time Plaintiff worked for Defendant TOWNES, she was subject to dozens of incidents of extreme screaming, throwing things, verbal and physical abuse, and threats. Defendant TOWNES's inability to control his violent temper severely altered the conditions of her work environment.

167. Other employees also witnessed his outbursts in the workplace.

**Defendant Townes Threatened Plaintiff**

168. After repeated requests to be compensated for her work, Defendant TOWNES instituted a shocking pattern and practice of using everything at his disposal to terrorize and frighten Plaintiff so she would just walk away.

169. Defendant TOWNES employed numerous tactics including but not limited to, blackmail, harassment, threatening Plaintiff and Plaintiff's young son, knowingly stealing family heirlooms and important personal possessions of Plaintiff and her son, and even going so far as to steal paperwork Plaintiff could use in this case against him.

170. Defendant TOWNES threatened Plaintiff's life in order to ensure that Plaintiff did not pursue any legal claims to retrieve her wages, bonus, or her promised share of the furniture and art as per their agreement.

171. The only bargaining chip Plaintiff had at her disposal was a small number of Defendant TOWNES items she had stored in her name, at his request, in a Toronto storage area.

172. Since Defendant TOWNES had a number of her personal clothing, bedding, boxes, and furniture pieces in his name in a storage area in Queens (some that he removed from Plaintiff's room without her permission), she begged in numerous emails for him to at least do this simple trade and give her and her young son's personal possessions back.

173. After well over two dozen documented requests, Defendant TOWNES refused to return the items unless Plaintiff would agree in writing to forfeit all her legal rights to collect the money he owed her from her hours worked. Plaintiff also believes that he was also afraid she would bring up the sexual abuse if she went to court for her wages.

174. Between February and June of 2018, on more than two dozen occasions in person (and more threats later sent by email), Defendant TOWNES hurt Plaintiff physically and emotionally and threatened to ruin her reputation. Defendant TOWNES subjected Plaintiff to extreme emotional and mental abuse to stop her from attempting to collect or pursue her back-owed salary or promised bonuses.

175. Plaintiff made many documented complaints and requests for Defendant TOWNES to stop the abuse. It only became worse.

176. The abuse and threats worked; Plaintiff became terrified, suffered weight loss, and became severely depressed.

177. As the abuse escalated, in an attempt to de-escalate his behavior, Plaintiff warned Defendant TOWNES to stop screaming and calm down as he was frightening her or she would call the police. This request inflamed Defendant TOWNES, and he screamed at the top of his lungs over and over that Plaintiff was bullying him and threatening him.

178. Plaintiff was sufficiently terrified and did not press charges against Defendant TOWNES on her police harassment complaints. She feared his wrath and rage would cause her irreparable personal, physical, and reputational injuries, and that he would follow through on his threats to damage her personal property, as he had done to his former wife's property.

179. On two occasions, when Defendant TOWNES' physical and emotional abuse became so overwhelming that Plaintiff was very frightened for her physical safety, Plaintiff made a frantic 911 call to the police to stop the immediate danger she felt she was in. Taking his threats seriously, she did not press charges.

180. Defendant TOWNES' numerous threats were made screaming at the top of his lungs as he stood over Plaintiff, ready to physically attack her.

181. Defendant TOWNES would come close to Plaintiff's face, just an inch or two away, and yell at the top of his lungs, **"YOU KNOW WHO I AM AND WHAT I AM CAPABLE OF!"**

182. By this statement, Defendant TOWNES was referring to the multiple times he told Plaintiff that he was going to buy a gun and kill his ex-wife.

183. Defendant TOWNES screamed, **"YOU WON'T SURVIVE THROUGH A COURT CASE!"**

184. Defendant TOWNES screamed, **"I will squash you like a little bug."**

185. Defendant TOWNES screamed, **"I will totally ruin your chances of ever working again."**

186. Defendant TOWNES screamed, **"I will destroy your reputation, you will be a social pariah when I'm finished with you!"**

187. Defendant TOWNES screamed, **"IF YOU DARE GO UP AGAINST ME IN COURT OR TO THE POLICE YOUR LIFE WILL BE OVER!!"**

188. Defendant TOWNES screamed, **"WHEN I FINISH WITH YOU YOU'LL BE A SOCIAL OUTCAST. NO ONE WILL WANT TO COME NEAR YOU!"**

189. Defendant TOWNES made several other clear indications that he would kill Plaintiff if she reported him to the police or otherwise took legal action against him.

190. By way of example, on one occasion, while holding Plaintiff's wrists and painfully shaking her, Defendant TOWNES screamed that he would hit Plaintiff many times harder if she reported anything to the police or took legal action against him.

191. Plaintiff was scared for her life and, most importantly, the life of her young son who was fourteen (14) years old at the time, who attended boarding school, and who visited on some holidays.


**Defendant TOWNES Steals Plaintiff's Possessions and Threatens Reputation**

192. With the intent of intimidating, coercing, and harassing Plaintiff so he could get away with his elaborate plan to never pay her wages or to make good on any of his work related bonus contracts, Defendant TOWNES knowingly and purposely stole items he knew were of great sentimental and physical value to Plaintiff such as a set of expensive real silver she had put safely in her room that was a gift from her deceased father.

193. To protect himself and further hedge his liability, Defendant TOWNES devised a plan by which he would steal a large number of Plaintiff's personal possessions, including bags of

her and her son's nice clothing, jewelry, electronics, a camera, a computer, paperwork she could use in court against him, priceless heirlooms, **items he knew were important and sentimental to her,** and her share of the furniture, a painting part of a business deal, and the art promised her in the final agreed-to contract.

194. Defendant TOWNES' only motive was to use Plaintiff's possessions to blackmail, coerce, and extort her into not pressing charges with the police or in court against him.

195. After over fifty (50) documented requests (and over 30 more in person) to get a fair settlement and get her stolen belongings back, Defendant TOWNES, in gross bad faith, flatly refused to even return Plaintiff's son's bag of nice clothing and a computer that he needed for school, causing Plaintiff to spend well over a thousand dollars replacing the clothes.

196. Defendant TOWNES knew that Plaintiff had a clean reputation, was admired as a business professional, and was popular in many social circles.

197. As further assistance to use as blackmail, several months earlier while simultaneously pretending to be open to a "fair unwind" or a "calm and fair settlement," Defendant TOWNES stole Plaintiff's business and personal contact lists from her computer so he could also use this as collateral.

198. Plaintiff, having spent a lifetime growing up within wealthy and powerful social circles, had contact information for some of the most important, influential people in the world.

199. These contact lists contained the personal numbers of First Families of the United States, Ambassadors, CEOs, and members of numerous royal families around the world.

200. In order to dissuade Plaintiff from bringing criminal and legal actions against Defendant TOWNES, Defendant TOWNES threatened to use the list, assuring Plaintiff that he would contact those people and "**ruin [Plaintiff's] reputation.**"

201. Plaintiff's contact list and corresponding notes are Plaintiff's life work and are priceless.

202. Plaintiff never provided Defendant TOWNES, or any person for that matter, her secret contact list, nor was it ever left in any public area.

203. This updated list was only kept in Plaintiff's laptop, which was password protected and locked in her closet.

204. During mediation, Defendant TOWNES stated with specificity in emails that he admits to taking this list and making a number of copies to blackmail Plaintiff with.

205. In emails, Defendant TOWNES threatened in writing to hurt Plaintiff's sterling reputation.

206. On or around July 29, 2018, Defendant TOWNES threatened Plaintiff in an email to the mutual friend they had asked to try and resolve the situation, "**Please forward this very important document to [Plaintiff], who has now blocked my emails. (Seems to be a favorite female tactic.) [...] Please note, if she sues, I will absolutely destroy her reputation.** (*sic*)"

207. On or around August 11, 2018, Defendant TOWNES repeated the many threats made to Plaintiff in person and wrote, "**I am reiterating what will happen if I am subjected to any legal hostilities [...] I copied about twenty pages of hundreds of contact details for almost everyone in [Plaintiff's] life [...] I now have multiple copies of this data [...] If I am attacked in a legal process, I will send out to many parties the simple truth about [Plaintiff] which utterly contradicts the image she so assiduously puts forth. Many**

**people, including me, love [Plaintiff's] positive qualities, but that will not stop me from retaliating if she attacks me with a lawsuit.** *(sic)"*

208. The mutual friend replied via email, "Choosing to engage in any illegal defamatory actions against [Plaintiff] in response to [Plaintiff] using legal means to pursue her legal interests would be unwise."

209. Defendant TOWNES knew that this would be a great scare tactic. Defendant TOWNES made multiple in-person threats around this theme which are too numerous to detail fully in this Complaint, and some of which are outlined below.

210. These threats were always made by Defendant TOWNES screaming at the top of his lungs and standing extremely close to Plaintiff's face with very aggressive and frightening body language.

211. Defendant TOWNES threatened Plaintiff, "**I will make sure you never work again!**"

212. Defendant TOWNES threatened Plaintiff, "**I will completely ruin your life if you dare to cross me!**"

213. Defendant TOWNES threatened Plaintiff, "**Think of how that will ruin your son's life too.**"

214. Threats to Plaintiff continued afterward in written format through emails and through phone conversations with Defendant TOWNES and with third parties engaged by TOWNES and Plaintiff to mediate the situation. All those attempts remained unsuccessful as TOWNES continued to threaten Plaintiff in the ways already described.

215. On or about May 6, 2018, realizing Defendant TOWNES had no intention of paying wages owed, Plaintiff wrote in an email, "The fact that you thought that you would just have me leave in three weeks, without half of the furniture or without a promissory note (as per your

written and verbal promises) for the replacement value in cash, is proof that you came into these negotiations with no intent to be at all fair with me."

216. Defendant TOWNES' violent temper tantrums and his screaming obscenities at Plaintiff were witnessed by his son Edward Townes, Plaintiff's minor son, the mutual mediator friend, workers in their apartment building, neighbors, assistants, maids, and the movers.

217. Defendant TOWNES sent many emails intended to terrorize Plaintiff.

218. Plaintiff was tremendously upset and depressed and could not handle the continued abuse.

219. After many threatening and harassing calls and emails, Plaintiff blocked Defendant TOWNES' number and further emails and engaged a mutual friend as a mediator to take over to cool down the altercations.

220. When requested by the mediator to keep his contract and pay at least a portion of what he legally owed Plaintiff, Defendant TOWNES devised another scheme and unreasonable excuse to not pay Plaintiff. Defendant TOWNES unlawfully calculated half of the rent for the time Plaintiff had worked for him, and included thousands more for the weeks the young assistants that had stayed to work for them both and told the mediator in writing that this back charged "rent" came to more than the tens of thousands he estimated he owed Plaintiff for her decorating and work.

221. As a further scare tactic to avoid paying wages Plaintiff was owed in accordance with their many oral and written agreements, Defendant TOWNES also threatened to tell the IRS about the cost of his guest room as part of her pay, saying they would come after her if she went to court.

222. During her time working for Defendant TOWNES, afraid to confront him in person, Plaintiff sent many emails that she perceived his behavior as hostile, abusive, and irrational. As her

employer, Defendant TOWNES was given many chances to remedy the situation and failed to take any corrective actions, subjecting Plaintiff to great psychological harm, physical harm, and a hostile work environment.

223. On or about December 16, 2017, Plaintiff pleaded to Defendant TOWNES: "When you lose control of your anger it severely hurts everyone around you. Please try hard to be soft, kind and to keep control at all times so you dont cause those around you to be pulled down into a depression or to be sad because of your anger. Thats all im asking. (*sic*)"

224. Defendant TOWNES subjected Plaintiff to a hostile work environment on the basis of and because of her sex.

225. Defendant TOWNES discriminated against Plaintiff on the basis of Plaintiff's gender, and because Plaintiff complained or opposed the unlawful conduct of Defendant TOWNES related to the above protected classes, and because Plaintiff did not accept his sexual advances.

226. The above are just some examples of the unlawful discrimination and retaliation to which Defendant TOWNES subjected Plaintiff.

227. As a result of Defendant TOWNES' unlawful and discriminatory actions, Plaintiff has endured unlawful humiliation resulting in extreme emotional distress, severe depression, excessive anxiety, panic attacks and physical ailments. During her last year with Defendant TOWNES, Plaintiff also lost over twenty (20) pounds from the extreme stress.

228. As a result of Defendant TOWNES' unlawful and discrimination actions, Plaintiff has endured, and continues to endure, extreme financial hardship and duress.

229. As a result of Defendant TOWNES' actions, Plaintiff felt extremely frightened, humiliated, degraded, victimized, embarrassed, was emotionally distressed and was diagnosed with PTSD.

230. Afraid Defendant TOWNES would act on his threats to hurt or even kill Plaintiff if she pursued any legal claims, Plaintiff has been afraid to even stay in one place for long, sign a lease, or even have mail delivery to a home address for well over a year.

231. As a result of Defendant TOWNES' unlawful and discriminatory actions, Plaintiff has endured irreparable damage to Plaintiff's life, ability to trust, and professional reputation.

232. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation, which such employment entails. Plaintiff has also suffered pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, the stability of a home, and other non-pecuniary losses. Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

233. As Defendant TOWNES' actions were malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages against Defendant TOWNES.

234. Defendant TOWNES knew he was blatantly violating many laws, as his bio reflects he "attended Harvard Law School."

235. Defendant TOWNES asked Plaintiff to put a number of items on her personal credit card for him, and although he paid for many of them, he left her with thousands of dollars of unpaid credit card bills that she has had to pay high interest rates on.

236. Plaintiff claims unlawful actual discharge.

237. Plaintiff claims alternatively (in the event Defendant TOWNES Claim so or that the Court determines) that Plaintiff is an Independent Contractor, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors.

## AS A FIRST CAUSE OF ACTION
## FOR VIOLATIONS OF 18 U.S.C. § 1030
## (AGAINST DEFENDANT TOWNES)

238. Plaintiff alleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

239. Plaintiff's computers are involved in interstate and foreign commerce and communication, and are protected computers under 18 U.S.C. § 1030(e)(2).

240. Defendant TOWNES knowingly and intentionally accessed Plaintiff's computers without authorization or in excess of authorization, and thereby obtained and used valuable information from those computers in violation of 18 U.S.C. § 1030(a)(2)(C). Such information included, but was not limited to: private sensitive communications between Plaintiff and stakeholders; confidential data; digital information confidential business and social address lists, including, phone numbers, cities and personal notes.

241. Defendant TOWNES knowingly caused the transmission of information or a program, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A).

242. Defendant TOWNES intentionally accessed a protected computer or computers without authorization, and as a result of such conduct, caused damage and loss, in violation of 18

U.S.C. § 1030(a)(5)(C), or recklessly caused damage, in violation of 18 U.S.C. § 1030(a)(5)(B).

243. Defendant TOWNES knowingly and with the intent to defraud, trafficked passwords and similar information from Plaintiff's systems, and such trafficking affected interstate or foreign commerce in violation of 18 U.S.C. § 1030(a)(6)(A).

244. Defendant TOWNES caused loss to one or more persons during a aggregating well over $5,000 in value.

245. As a result of Defendant TOWNES's actions in violation of the sections above, Plaintiff has been damaged in an amount to be determined at the time of trial.

## AS A SECOND CAUSE OF ACTION
## FOR VIOLATIONS OF 18 U.S.C. § 2510-22
## (AGAINST DEFENDANT TOWNES)

246. Plaintiff alleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

247. Each of the above-listed Defendant TOWNES is a "person" within the meaning of 18 U.S.C. §§ 2510, 2511.

248. In violation of 18 U.S.C. § 2511(1)(c), Defendant TOWNES willfully and intentionally endeavored to disclose and did disclose the contents of Plaintiff's wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

249. In violation of 18 U.S.C. § 2511(1)(d), Defendant TOWNES willfully and intentionally endeavored to use and did use the contents of wire, oral, electronic communications,

knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

250. Plaintiff had a justifiable expectation that her wire, oral, or electronic communications were not subject to interception.

251. Plaintiff is a "person" whose wire, oral, or electronic communications were intercepted within the meaning of 18 U.S.C. § 2520.

252. As a direct result of Defendant TOWNES's actions in violation of the sections above, Plaintiff has been damaged in an amount to be determined at the time of trial.

## AS A THIRD CAUSE OF ACTION
## FOR VIOLATIONS OF 18 U.S.C. § 2510-22
## (AGAINST DEFENDANT TOWNES)

253. Plaintiff alleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

254. Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 2510(6) and 2707(a).

255. Defendant TOWNES willfully and intentionally accessed without authorization a facility through which an electronic communication service is provided, namely, the Plaintiff's computer systems, thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a).

256. As a direct result of these willful and intentional violations, Plaintiff has suffered damages and, as provided for in 18 U.S.C. § 2707, seeks an award of the greater of the actual damages suffered or the statutory damages; punitive damages; attorneys' fees and other costs of this action; and appropriate equitable relief.

## AS A FOURTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW
## (AGAINST DEFENDANT TOWNES)

257. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

258. New York State Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, [Effective January 19, 2016: familial status,] marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

259. Defendant TOWNES engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of Plaintiff's sex/gender, as well as creating a hostile work environment.

260. Plaintiff hereby makes a claim against Defendant TOWNES under all of the applicable paragraphs of New York State Executive Law Section 296 including sex/gender and race.

261. Defendant TOWNES violated the above and Plaintiff suffered numerous damages as a result.

## AS A FIFTH CAUSE OF ACTION
## FOR RETALIATION UNDER STATE LAW
## (AGAINST DEFENDANT TOWNES)

262. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

263. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

264. Defendant TOWNES engaged in an unlawful discriminatory practice by retaliating and otherwise discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of Plaintiff's opposition to the unlawful practices of Defendant TOWNES.

265. Plaintiff makes a claim against Defendant TOWNES under all of the applicable paragraphs of New York State Executive Law Section 296.

266. Defendant TOWNES violated the above and Plaintiff suffered numerous damages as a result.

## AS A SIXTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## (AGAINST DEFENDANT TOWNES)

267. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

268. The Administrative Code of the Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

43

269. Defendant TOWNES engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff as set forth herein.

270. Plaintiff hereby makes a claim against Defendant TOWNES under all of the applicable paragraphs of New York City Administrative Code Title 8.

271. Defendant TOWNES violated the above and Plaintiff suffered numerous damages as a result.

## AS A SEVENTH CAUSE OF ACTION
### FOR RETALIATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (AGAINST DEFENDANT TOWNES)

272. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

273. The New York City Administrative Code Title 8, §8-107(1) (e) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . . "

274. Each of the Defendant TOWNES engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Tide 8, §8-107(1) (e) by discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

275. Plaintiff hereby makes a claim against Defendant TOWNES under all of the applicable paragraphs of New York State City Administrative Code Title 8.

276. Defendant TOWNES violated the above and Plaintiff suffered numerous damages as a result.

## AS AN EIGTH CAUSE OF ACTION
## FOR INTERFERENCE UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## (AGAINST DEFENDANT TOWNES)

277. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

278. New York City Administrative Code Title 8-107(19) Interference with protected rights states, in relevant part: It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

279. Defendant TOWNES violated the section cited herein as set forth and Plaintiff suffered numerous damages as a result.

## AS A NINTH CAUSE OF ACTION
## FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST DEFENDANT TOWNES)

280. Plaintiff repeats and re-alleges each and every allegation made in the complaint as if they were set forth herein fully at length.

281. Defendant TOWNES' behavior was extreme and outrageous to such extent that the action was atrocious and intolerable in a civilized society.

282. Defendant TOWNES' conduct was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency.

283. Defendant TOWNES caused Plaintiff to fear for Plaintiff's own safety and life.

284. Defendant TOWNES' breach of duties to Plaintiff caused Plaintiff to suffer numerous injuries as set forth herein.

285. As a result of Defendant TOWNES' acts, Plaintiff has been damaged in an amount to be determined at the time of trial.

## AS A TENTH CAUSE OF ACTION
## FOR VIOLATING THE GENDER MOTIVATED VIOLENCE PROTECTION ACT
## (AGAINST DEFENDANT TOWNES)

286. Plaintiff repeats, reiterates and re-alleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

287. N.Y. ADC. LAW § 8-903 states in relevant part "For purposes of this chapter: a. "Crime of violence" means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction. b. "Crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.

288. N.Y. ADC. LAW § 8-904 : NY Code – Section 8-904: Civil Cause of Action states in relevant part "Except as otherwise provided by law, any person claiming to be injured by an individual who commits a crime of violence motivated by gender as defined in section 8-903

of this chapter, shall have a cause of action against such individual in any court of competent jurisdiction for any or all of the following relief: 1. compensatory and punitive damages; 2. injunctive and declaratory relief; 3. attorneys' fees and costs; 4. such other relief as a court may deem appropriate."

289. N.Y. ADC. LAW § 8-905 Limitations states in relevant part: "a. A civil action under this chapter must be commenced within seven years after the alleged crime of violence motivated by gender as defined in section 8-903 of this chapter occurred. . . . c. Nothing in this section requires a prior criminal complaint, prosecution or conviction to establish the elements of a cause of action under this chapter.

290. Defendant TOWNES's conduct constitutes crimes of "violence motivated by gender" under The Victims of Gender-Motivated Violence Protection Act ("VGMVPA").

291. Defendant TOWNES violated the sections cited herein as set forth and Plaintiff suffered numerous damages as a result.

**AS AN ELEVENTH CAUSE OF ACTION
FOR ILLEGAL DEDUCTIONS FROM WAGES
UNDER THE NEW YORK LABOR LAW
(AGAINST DEFENDANT TOWNES)**

292. Plaintiff repeats, reiterates and re-alleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length

293. Defendant TOWNES made deductions from the wages of Plaintiff. These deductions were made without the authorization of Plaintiff. The wage deductions thus violated the New York Labor Law, § 193.

294. Defendant TOWNES' wrongful deductions from the wages of Plaintiffs and other class members were willful within the meaning of the New York Labor Law, § 198.

47

295. Plaintiff was injured by Defendant TOWNES' illegal deductions from her wages.

296. Plaintiff is entitled to her unpaid minimum wages as a consequence of the Defendant TOWNES' unlawful actions and omissions, in accordance with New York Labor Law § 198(1-a).

### AS A TWELVTH CAUSE OF ACTION
### FOR FAILURE TO PAY MINIMUM WAGE
### IN VIOLATION OF NEW YORK LABOR LAW
### (AGAINST DEFENDANT TOWNES)

297. As a direct result of Defendant TOWNES' acts, Plaintiff has been damaged in an amount to be determined at the time of trial.

298. Defendant TOWNES employed Plaintiff and willfully failed to compensate Plaintiff for the time actually worked, at a rate of at least minimum wage, in violation of the requirements of NYLL.

299. By the course of conduct set forth above, Defendant TOWNES has violated N.Y. Lab.Law § 652 et seq.; 12 N.Y.C.R.R. § 142 et seq.

300. Defendant TOWNES has a policy and practice of refusing to pay regular compensation to Plaintiff.

301. Defendant TOWNES's failure to pay at least minimum wage compensation to Plaintiff was willful within the meaning of N.Y. Lab.Law §652.

302. As a consequence of the willful underpayment of wages, alleged above, Plaintiff has incurred damages, attorney's fees, interest, and costs to be paid by the Defendant TOWNES as provided by the NYLL.

## AS A THIRTEENTH CAUSE OF ACTION
## FOR FAILURE TO PAY OVERTIME
## IN VIOLATION OF NEW YORK LABOR LAW
## (AGAINST DEFENDANT TOWNES)

303. Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

304. Defendant TOWNES employed Plaintiff for workweeks longer than 40 hours and willfully failed to compensate Plaintiff for the time worked in excess of 40 hours per week, at a rate of at least one and one-half times their regular hourly rate, in violation of the requirements of NYLL.

305. By the course of conduct set forth above, Defendant TOWNES has violated N.Y. Lab.Law § 650 et seq.; 12 N.Y.C.R.R. § 142 et seq.

306. Defendant TOWNES has a policy and practice of refusing to pay regular and overtime compensation to Plaintiff.

307. Defendant TOWNES's failure to pay overtime compensation to Plaintiff was willful within the meaning of N.Y. Lab.Law §663.

308. As a consequence of the willful underpayment of wages, alleged above, Plaintiff has incurred damages, attorney's fees, interest, and costs to be paid by the Defendant TOWNES as provided by the NYLL.

## AS A FOURTEENTH CAUSE OF ACTION
## SPREAD OF HOURS COMPENSATION UNDER
## NEW YORK LABOR LAW
## (AGAINST DEFENDANT TOWNES)

309. Plaintiff's repeats and re-allege each and every allegation made in the above paragraphs of this Complaint as if set forth more fully herein.

310. Defendant TOWNES willfully violated Plaintiff's rights by failing to pay Plaintiff an additional hour of pay at minimum wage for each day worked more than ten (10) hours, in violation of the New York Minimum Wage Act and its implementing regulations, N.Y. Labor Law §§ 650 *et seq.*; 12 N.Y.C.R.R. § 142-2.4.

311. Due to Defendant TOWNES's New York Labor Law violations, Plaintiff is entitled to recover from Defendant TOWNES her unpaid spread of hours compensation, reasonable attorneys' fees, and costs of this action pursuant to N.Y. Labor Law § 663 (1).

312. Plaintiffs repeat and re-allege each and every allegation made in the above paragraphs of this Complaint as if set forth more fully herein.

**AS A FIFTEENTH CAUSE OF ACTION**
**VIOLATION OF THE NOTICE AND RECORDKEEPING REQUIREMENTS OF**
**THE NEW YORK LABOR LAW**
**(AGAINST DEFENDANT TOWNES)**

313. Defendant TOWNES failed to keep employee-specific records documenting, *inter alia*, actual hours worked in each week, in violation of New York Labor Law § 661 and 12 NYCRR 142-2.6.

314. Defendant TOWNES failed to keep employee-specific records documenting, *inter alia*, actual hours worked in each week, in violation of New York Labor Law § 661 and 12 NYCRR 142-2.6.

315. Defendant TOWNES failed to furnish statements with pay and hour information to Plaintiff, in violation of 12 NYCRR 142-2.7.

316. On account of such violations, Defendant TOWNES is liable to Plaintiff for actual, statutory and liquidated damages.

## AS A SIXTEENTH CAUSE OF ACTION
## FOR FRAUD
## (AGAINST DEFENDANT TOWNES)

317. Plaintiff repeats, reiterates and re-alleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length

318. Defendant TOWNES acted to recruit Plaintiff through false representations as to facts about work conditions, payment, and reimbursement. Defendant TOWNES made these representations for the purpose of inducing Plaintiff into coming to New York and leaving her life behind in Florida.

319. At the time of her recruitment, Plaintiff was promised wages far in excess of the amounts ultimately received for her labor.

320. Defendant TOWNES made many such promises to Plaintiff knowing them to be false, with the intent to induce Plaintiff to work under him in New York, and ultimately to exploit Plaintiff.

321. Defendant TOWNES also made many such promises to Plaintiff in order to induce Plaintiff into remaining in his employ despite the lack of payments to her.

322. Plaintiff reasonably did rely on the false representations made by Defendant TOWNES. This reliance occurred in ignorance of the falsity of Defendant TOWNES' representations.

323. Plaintiff was injured because of her reliance on the false representations made by Defendant TOWNES.

324. As a direct result of Defendant TOWNES' acts, Plaintiff has been damaged in an amount to be determined at the time of trial.

## AS A SEVENTEENTH CAUSE OF ACTION
### BREACH OF CONTRACT
### (AGAINST DEFENDANT TOWNES)

325. All above paragraphs are repeated herein as if set forth fully at length.

326. Defendant agreed Plaintiff would work for him and provide services..

327. Defendant also agreed to pay Plaintiff for Plaintiff's services.

328. Defendant has failed to complete or fully perform his obligations.

329. Defendant have also breached their covenants of good faith and fair dealing in their dealings with Plaintiff.

330. By reason of the foregoing, Defendant breached the subject contracts (written and oral) with Plaintiff.

331. By reason of the foregoing, Plaintiff has been damaged an amount to be determined at trial.

## AS AN EIGHTEENTH CAUSE OF ACTION
### QUANTUM MERUIT
### (AGAINST DEFENDANT TOWNES)

332. All above paragraphs are repeated herein as if set forth fully at length.

333. Plaintiff rendered valuable services.

334. The services were rendered to Defendant.

335. The services were accepted, used, and enjoyed by Defendant.

336. Defendant was aware that Plaintiff, in performing the services, expected to be paid by Defendant.

337. Defendant violated the section cited herein as set forth and Plaintiff suffered numerous damages as a result.

## AS A NINTEENTH CAUSE OF ACTION
## UNJUST ENRICHMENT
## (AGAINST DEFENDANT TOWNES)

338. All above paragraphs are repeated herein as if set forth fully at length.

339. Plaintiff has expended numerous hours and monies in performing the above work for Defendant.

340. As a result of the above, Defendant has received an enrichment.

341. As a result of the above, Plaintiff has suffered an impoverishment.

342. There exists a connection between the enrichment and the impoverishment.

343. There is an absence of a justification for the enrichment and impoverishment.

344. Plaintiff pleads in the alternative, that in the event there is no other remedy under law, Plaintiff is entitled to recovery under the doctrine of unjust enrichment.

## AS A TWENTIETH CAUSE OF ACTION
## PROMISSORY ESTOPPEL
## (AGAINST DEFENDANT TOWNES)

345. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

346. Plaintiff relied on the Defendant's above promises by relocating from her established home in Florida and continuing to work for Defendant despite not receiving any payments, to Plaintiff's detriment.

347. Defendant continuously assured Plaintiff that they had an agreement and that she would be paid.

348. Indeed, to date, Defendant has failed to discuss the matter any further with Plaintiff and has refused to pay Plaintiff what Plaintiff is owed.

349. Defendant is in breach of the above agreements.

350. Despite repeated demands, Defendant has refused to make payments to Plaintiff.

351. As a result of the above, Plaintiff has been damaged in an amount to be determined at trial in excess of the jurisdictional limits of all lower courts.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in an amount which exceeds the jurisdiction of all lower courts for all damages including but not limited to compensatory damages, punitive damages, statutory damages, attorney's fees, costs, interest and all other damages as are just and proper to remedy Defendant TOWNES' unlawful employment practices.

<u>**JURY DEMAND**</u>

Plaintiff demands a trial by jury as to all issues so triable.

Date:   New York, New York

Aug 28        , 2019

Respectfully Submitted,
**DEREK SMITH LAW GROUP, PLLC.**
*Attorneys for Plaintiff*

BY:

Danilo Bandovic, Esq.
1 Pennsylvania Plaza, 49th Floor
New York, New York 10119
(212) 587-0760